[Crim. No. 3609. In Bank.—June 1, 1933.]

THE PEOPLE, Respondent, v. JOHN C. FLEMING, Appellant.

302

Robert E. O'Neill for Appellant.

U. S. Webb, Attorney-General, and William F. Cleary, Deputy Attorney-General, for Respondent.

CURTIS, J.—Defendant was accused of the crime of murder, together with three prior convictions. The first

prior conviction of which defendant was charged was burglary; the second, robbery; and the third, assault with intent to commit murder. All of said convictions were under judgments rendered in this state. Defendant admitted the prior convictions, but pleaded not guilty to the charge of murder. He was tried by a jury which rendered a verdict of guilty of murder in the first degree without fixing the punishment for said crime. The court thereupon rendered judgment imposing the death penalty. From this judgment and from an order denying his motion for a new trial the defendant has appealed. Appellant in his brief has set forth thirty-two specifications wherein he claims that error was committed, and upon which he relies for a reversal of the judgment. These specifications are discussed quite fully in a lengthy brief in which each is given attention in detail. The argument of appellant may be properly divided into four general divisions in which the following contentions are respectively made:

1. That the evidence is insufficient to support a verdict of guilty in that it shows that defendant took the life of the deceased in defense of his own.

2. That the evidence is insufficient to support a verdict that defendant was guilty of the crime of murder, or any other or greater crime than manslaughter.

3. Misconduct on the part of the district attorney which was prejudicial to the rights of the defendant.

4. That the court erred in the admission and rejection of evidence.

The contention of the defendant that the evidence is insufficient to support a verdict of guilty against the defendant, in that it shows that he acted in self-defense in the killing of the deceased, rests upon the claim of defendant that the deceased, at the time defendant drew his gun, held in his hand an automobile crank and that he was then in the act of striking defendant over the head with said automobile crank when the defendant shot the deceased to protect himself from death or great bodily injury. This claim is unsupported except by the uncorroborated testimony of the defendant. It is inconsistent with the evidence of all the other witnesses in the case present at the shooting. Mrs. Leece, the wife of the deceased, Amos Leece,

was the only eye-witness to the shooting other than defendant and deceased. She was in deceased's machine, and the shooting took place on the opposite side. of the machine in which she was sitting. She was evidently in a greatly agitated and excited state of mind due to the tragic death of her husband and her account of the affair was conflicting, incomplete and exceedingly indefinite. Her testimony will be referred to later. At the time of the shooting four people were in the Midway Gas Station, in front of which the deceased was killed. One of them, Peggy O'Day, was so intoxicated that she was in no condition to give any account of what happened, and she did not attempt to do so. The other three persons in the building, Charles Adcock, the proprietor of the station; Marie Young, his housekeeper, and Angus Kerr, a patron at the station, immediately rushed out of the building on hearing the shots from defendant's gun on to the front porch of the building where the shooting took place. They saw nothing of any automobile crank in the hands of the deceased or on the floor of the porch, or in the vicinity of the porch. Adcock and Kerr had seen the deceased as he left the front room of the building and went out on to the porch just prior to the shooting, and neither of them saw any automobile crank in his hand. The defendant himself, who came into the room from the porch just as the deceased turned to leave the room, also says that he saw no weapon of any kind in Leece's hand as the latter walked toward the door to go out on to the porch. The defendant's testimony is that he was standing some two steps within the room in front of the door, and that the deceased pushed him backward through the door, and then followed him on to the porch, and that as soon as he, the defendant, recovered himself, "Mr. Leece had this crank in his hand coming toward me with it." But how or where Leece secured the crank the defendant does not attempt to show. The whole affair happened within a few seconds of time. The shots were fired, according to Adcock, a couple of seconds after the men went through the door on to the porch. Angus Kerr testified that "they had scarcely disappeared out of the door when two shots rang out; just as they disappeared out of the door two shots went off". The testimony of the defendant that deceased assaulted him with an automobile crank taken by itself is not at all convincing,

and, when we consider it in connection with the other evidence in the case, we are of the opinion that it is completely overcome and discredited. The facts immediately preceding the shooting will be given in detail in discussing another phase of the case. It is not necessary to state them here. The verdict of guilty, therefore, finds ample support in the evidence.

In connection with the automobile crank, however, it should be said that Mrs. Leece, after denying that her husband had any such crank that evening, testified that when her husband came out to the machine after paying his bill in the station, he went to the rear of the machine where the crank was kept and took it out of the machine for the purpose of cranking his machine. She did not, however, see what her husband did with the crank when he re-entered the building. Some hours after the killing the crank was found on the floor of Leece's machine. If we disregard the testimony of the defendant, as the jury evidently did, and we think properly so, then the only reasonable construction to place upon the acts of Leece is that when he decided to return to the barroom, he returned the crank to the machine, where it remained until found there some hours later. This construction harmonizes with all the evidence in the case, including that of the defendant that Leece did not have the crank with him when he was last in the front room of the station.

We now pass to the consideration of the second general contention of the defendant that there is no evidence in the case that justified a verdict finding defendant guilty of murder, or any crime greater than manslaughter. In support of this phase of the case, the defendant contends that the evidence is insufficient to show either malice, premeditation, or an intent to kill on his part before or at the time he fired the shots which resulted in the death of Amos Leece. A consideration of this contention will require a somewhat more extended reference to the events leading up to the shooting that has heretofore been given.

The Midway Service Station is about a mile north of the town of Red Mountain on the highway from Atolia to Randsburg. At the time in question it was conducted by Charles Adcock, who lived at the station. There was also

living there at the time Marie Young, who acted as his housekeeper, and Peggy O'Day. The latter had been brought by the defendant from Long Beach, her home, to the Midway Service Station some time in the month of January, 1932. The homicide occurred on May 21, 1932. Peggy O'Day was stopping at the station, ostensibly for her health, although the evidence shows that she was engaged in prostitution during her stay at the station. The Midway Service Station was located on the westerly side of the highway. The main building consisted of a large front room generally referred to as the front or barroom. Across the northerly end there extended a counter or bar. There was a cement porch in the front part of the building with solid walls, except an eight-foot opening in the center through which entrance from the driveway was gained to the porch. A door opposite this entrance opened from the porch into the front or main room of the building. There was a kitchen and some four bedrooms in the building. Besides gas and oil, Adcock kept for sale at the station, soft drinks, tobacco, cigars and other small articles of merchandise. The gasoline pump was located in front of the eight-foot opening in the porch, and between the pump and the porch was a driveway. After bringing Peggy O'Day to the station in January, the defendant had visited her on two or three occasions. The last of these visits was on the day of the tragedy. He arrived late in the morning, and after having "breakfast" with Charles Adcock and Marie Young at 12 o'clock he and Peggy O'Day left for Red Mountain, where they visited friends and imbibed rather freely of intoxicating liquors, with the result that when they returned to the station in the evening, Peggy O'Day was in an intoxicated condition, and the defendant was not far from that state. They returned to the station at about 7:10 in the evening and entered the building through the rear door. Some fifteen minutes before their return to the station, the deceased, Amos Leece, and his wife drove up to the station for the purpose of getting some gasoline and making other minor purchases. Leece was in charge of the pump of the Randsburg Water Company at its plant some six or seven miles distant, where he lived with Mrs. Leece. On the evening in question he drove into the station and stopped

his machine in front of the building with the rear of his car near the gasoline pump. After securing a supply of gasoline, he and Mrs. Leece went into the front room of the building where Mrs. Leece made some small purchases, and Mr. Leece paid his bill. He was standing in front of the counter or bar settling the bill when Peggy O'Day entered the room through the rear entrance of the building. She immediately approached Leece, and asked him to buy her a drink, and on his refusal began to abuse him and apply vile epithets to him. Leece seemingly disregarded her, but as he turned to leave, he remarked to her, "I think you are a cheap, chippy whore", and left the room through the front door for his car. Mrs. Leece had preceded him and was sitting in the front seat of the car as Leece came out of the room. As Leece was leaving the room the defendant entered through the rear door. He had heard the remark which Leece had made to Peggy O'Day. He followed Leece out to the latter's car, and there demanded of Leece that he apologize to Peggy O'Day for the remark just made to her. Leece declined to do so, and reiterated in substance to the defendant the remark which he had previously made to Peggy O'Day. He then returned to the barroom, and complained to Charles Adcock, who was behind the counter, that if he could not come to the station without being insulted he would quit trading there. After making this complaint to Adcock he turned to leave the room again through the front door. As he approached the door, the defendant was standing in the room about two steps in front of the door. Deceased pushed defendant out of his way, and in doing so pushed him through the door, and then stepped through the door himself, when the three shots were fired as already stated. Adcock, Marie Young and Angus Kerr immediately rushed to the porch, where they found the defendant standing over the deceased. He had hold of his gun by its handle and the two men were struggling for its possession. The deceased was down on the porch either on his knees or, as one witness described his position, "he was lying on his right hip with his left hand down on the cement and his right hand up over the hammer of the gun, shut down tight". Adcock and Marie Young joined in the struggle for the gun. Adcock finally succeeded in securing

possession of it. He gave it to Marie Young, who hid. it. The defendant in a few minutes left in his machine, but returned after an absence of four or five minutes. He asked Marie Young for his gun, but she refused to give it to him. He then lay down in one of the clothes closets of the house, where he was found and taken into custody by officers upon their arrival. After the shooting the deceased, without changing his position, lay on the floor some ten minutes. He died later without making any statement regarding the shooting. He did not speak after he was shot. Upon the examination of his body after his death, it was found that he had one wound in the upper part of his body, evidently made by a bullet, which entered his right armpit and ranging downward left the body about eight inches below the point of entrance. The other wound was in his abdomen, the bullet entering the body about one inch to the left of his navel, ranging backward and downward, and leaving the body through the left buttock. In its course the bullet perforated the muscles of the stomach and the small intestines as well as other parts of his body. There were large hemorrhages of blood from this wound, and in the opinion of the doctor who performed an autopsy on the body of the deceased it was a fatal wound. Holes were also found in one of the legs of deceased's trousers which evidently had been made by the third shot. The pistol used by the defendant was a 45-caliber revolver. There was also found on the porch recent evidence of bullets striking the cement floor of the front porch and then glancing off and embedding themselves in the wall of the porch, showing that evidently two of the bullets fired by the defendant, after going through the body of the deceased, had force enough to plow holes in the cement floor and then bury themselves in the adjoining wall of the porch. The occupation of the defendant for some months prior to and at the time of the shooting was acting as floor manager on the Rose Isle, one of the gambling boats anchored on the high seas off of the coast of Long Beach. He also acted as guard on Friday and Saturday night in taking the cashier of the boat to his home. He was an intimate friend of Peggy O'Day. In fact, he testified that they were engaged to be married.

We think that a mere recitation of the foregoing facts shows that there was ample evidence to justify the implied finding of malice. While it is the law of this state that in order to sustain a conviction of murder it is not necessary to show personal enmity on the part of the defendant against the deceased (*People* v. *Sainz*, 162 Cal. 242 [121 Pac. 922], we think the evidence is sufficient in this case to show that the defendant at and just prior to the deadly assault did entertain a strong feeling of resentment against the deceased. In the first place, it plainly appears that the defendant took offense at the remark made by the deceased to and concerning Peggy O'Day, as the deceased left the counter or bar to go to his machine. This is shown by the defendant following the deceased to the front porch, and there demanding of the deceased that he apologize to Peggy O'Day. Not only did the deceased refuse to make such an apology, but he reiterated his statement to the defendant, and later pushed the defendant out of his way as he [deceased] left the front room through the door opening out on to the porch. It was then that the defendant drew his pistol and fired the fatal shots. Evidently the defendant keenly resented the conduct of the deceased toward Peggy O'Day and towards himself, and acting under the spell of this resentment, shot the deceased. Evidence of previous difficulties between the parties is always admissible to show the state of mind of the defendant and that he acted with malice. (*People* v. *Bradfield*, 30 Cal. App. 721 [159 Pac. 443].) With much greater force would evidence of present and pending difficulties show the presence of malice on the part of the defendant toward the deceased. While the conduct of the deceased in pushing the defendant out of his way and through the door was uncalled for, it afforded the defendant no justification in taking the life of the deceased. The deceased was unarmed at the time and defendant was not in peril either of death or bodily injury. His act in taking the life of the deceased under these circumstances was, therefore, not justifiable. As before observed, however, the pushing or shoving of the defendant through the door by the deceased evidently added to the resentment of the defendant already aroused in him by the remarks of the deceased concerning Peggy O'Day.

Smarting under what the defendant evidently felt was a twofold injury, he drew his gun and killed the deceased. The jury was justified under this state of facts in drawing the inference that the defendant acted with malice in taking the life of Amos Leece.

Under the contention that the evidence fails to show premeditation or deliberation on the part of the defendant in the killing of the deceased, appellant in his brief says, "there is an entire lack of evidence either direct or circumstantial in nature consisting of facts proven from which the jury might have reasonably or logically inferred that the killing was wilful, deliberate or premeditated". With this statement we cannot agree. It is true that no great interval of time elapsed from the time the deceased pushed the defendant through the door until the defendant drew his gun and shot the deceased. But this court has said on innumerable occasions that in order to prove premeditation in one charged with murder it is not necessary to show that any appreciable space of time elapsed between the intention to kill and the act of killing. It is only necessary to quote from *People* v. *Hunt,* 59 Cal. 430, 435, the following statement of the law on this subject: "There need be no appreciable space of time between the intention to kill and the act of killing; they may be as instantaneous as successive thoughts of the mind. It is only necessary that the act of killing be preceded by a concurrence of will, deliberation, and premeditation on the part of the slayer, and if such is the case, the killing is murder in the first degree, no matter how rapidly these acts of the mind may succeed each other, or how quickly they may be followed by the act of killing." The precise language of this decision has been repeated on numerous occasions by this court and the principle there enunciated is irrevocably established as a part of the law of this state. (*People* v. *Bellon,* 180 Cal. 706, 710 [182 Pac. 420].) In the instant case, while the testimony, already quoted shows that the defendant shot almost, if not immediately, after the two men went through the door, still there was time for the defendant to think before he acted, to deliberate between the intention to kill and the act of killing. Defendant had time to draw his gun and fire the shots. He formed the intention to draw his gun, and then acted upon that intention. He drew his gun with some

intention—either to defend himself, to frighten the deceased or to kill the deceased. After forming the intention, whatever it was, he acted upon it by firing his gun. He thus had time to think and to act. This is all that is necessary in order to show premeditation.

If the intention thus formed was to kill the deceased, he is guilty of murder in the first degree. Appellant contends that the evidence fails to show any such intention. This contention is based almost wholly upon defendant's version of the shooting. In addition to his evidence as heretofore given, he also testified that he drew his gun and hit the deceased over the head with it; that the deceased grabbed the gun and in the struggle for its possession it was discharged three times. There was a wound on the side of deceased's head about three or four inches above the left ear. This could have been made in the manner described by the defendant. On the other hand, Angus Kerr, who was standing by a window opening out on to the front porch, testified that on hearing the shots he looked out of the window, and the deceased was down on the floor of the porch and defendant was striking him over the head with his gun. The wound on deceased's head could, therefore, have been caused by the defendant striking deceased on the head after the shots were fired. Then again we think that both the element of time and the quick succession in which the shots were fired render defendant's testimony highly improbable. As stated already, those in the room at the time the shots were fired testified that two shots were fired in quick succession immediately after the two men went through the door, which were followed in a slightly longer interval of time by a third shot. This testimony would appear to refute the testimony of the defendant that the shots were fired in a struggle for the possession of the gun after he had hit the deceased over the head with it. Then if the two first shots were fired in quick succession, followed almost immediately by the third shot, as was shown by the evidence, it is not likely that they were discharged as a result of a struggle over the possession of the gun. In support of defendant's contention that he hit the deceased over the head with his gun, and that the deceased was on his knees when the gun was first discharged, defendant further relies upon the location and courses of the wounds found

upon the deceased's body and testified to by the autopsy physician. Defendant contends that the wound in the right armpit was made by the first shot, and that as it ranged downward and left the body some eight inches below the point of entrance, the course taken by the bullet causing the wound would sustain the theory that it was fired while the deceased was on his knees and the defendant was standing over him. There is nothing, however, to show which wound was inflicted by the first shot. If we take the wound in the deceased's abdomen as inflicted by the first shot, it could well have been made while the two men were standing facing each other. In fact it could hardly have been made with the men in any other position. The direction of this wound was to the rear and slightly downward. It was undoubtedly a fatal wound and caused the defendant to fall to the floor and either while in the act of falling or after he had fallen, the wound in his armpit was received as the result of either the second or third shot. The nature of the wounds on the deceased's body and their courses through the body do not, in our opinion, help the cause of the defendant. On the other hand, the evidence regarding these wounds, taken in connection with that given by those in the room at the time the shots were fired may well have indicated to the jury that the shots were fired by defendant intentionally and as soon as the defendant was able to draw his gun after being pushed through the door by the deceased. Where one assaults another violently with a deadly weapon and takes his life the presumption is that the assailant intended death or great bodily harm. (13 Cal. Jur., p. 683.) And where, as in this case, the assault was made in a manner that was reasonably certain to produce death, and which actually did cause death, the only rational presumption to be drawn therefrom is that the assailant intended to take the life of the person assailed. We have already referred to the deadly character of the weapon used by the defendant. The circumstances of the killing show that defendant deliberately fired a bullet from this 45-caliber gun into the vital organs of the deceased, causing almost instant death. This evidence plainly shows an intent on his part to take the life of the deceased, and thus a clear case of murder is made out against the defendant.

Defendant seeks to compare this case with the cases of *People* v. *Kelley,* 208 Cal. 387 [281 Pac. 609], and *People* v. *Howard,* 211 Cal. 322 [295 Pac. 333, 71 A. L. R. 1385], and asks that in its decision this court should follow the course pursued in those cases and reduce the judgment of murder in the first degree to one of a lesser offense included in the charge of murder. We see no similarity between the instant case and the two cited cases. It is not necessary to occupy space here in order to show wherein the difference exists. A reading of the two cases cited we think will show that they can be readily differentiated from the case now before us, and that they furnish no true test for the determination of the instant case.

█ The claim of defendant that the judgment should be reversed by reason of misconduct on the part of the district attorney prosecuting the case rests upon certain questions propounded by the district attorney on cross-examination to the defendant while the latter was a witness in the case. By these questions it was brought out that the defendant had no permit to carry a gun; that he had filed off the number of the gun which he was carrying on his visit to the Midway Service Station, and that he had filed two notches on the barrel of said gun. No objection was made to any of the questions eliciting this evidence, nor was any motion made to strike out this evidence. The defendant claims that he was prejudiced by the evidence that he had no permit to carry a gun and that he had filed off the number on his gun, for the reason that being a former convict it was unlawful for him to own or have in his possession a firearm like the gun in evidence, and also that it was unlawful for anyone to have in his possession a pistol or revolver the number of which had been obliterated. The position of the defendant is that by the introduction of this evidence the prosecution was permitted to prove other crimes than the one of which he was charged and which were unconnected with the crime charged. But this evidence came in without objection on defendant's part and it is now too late to raise the point that it was inadmissible. The defendant admits this, but claims that it was misconduct on the part of the district attorney to elicit such evidence in the presence of the jury. The point is without merit— if we concede that the evidence was inadmissible—for the

defendant had it within his power by proper objection to exclude this evidence. Failing to do so at the time it is now too late for him to complain. The criticism of the district attorney in asking the defendant whether he had made the two notches on the gun is equally without merit. The gun was in evidence as belonging to the defendant, and we must assume that the two notches were apparent to the members of the jury. Whatever inferences prejudicial to the defendant the jury might draw from the presence of these two notches on the gun might arise as readily without the admission of the defendant that they were made by him as with such evidence. Naturally the jury, if they were disposed to draw any prejudicial inferences from the fact that two notches had been made on the defendant's gun, in the absence of any evidence as to how the notches came to be there, would assume that the defendant was responsible for their existence and his admission to that effect would not materially aggravate their state of mind in that respect. We are, therefore, of the opinion that the defendant was not in any way prejudiced by any act of the district attorney in the prosecution of the case.

■ The final claim of defendant is that the judgment should be reversed by reason of errors on the part of the trial court in the admission and rejection of evidence. The evidence which the defendant contends was improperly admitted concerns those matters which we have already alluded to, and relates to the notches on defendant's gun and that he had no permit to carry the same. We have sufficiently discussed these matters under the claim that the eliciting of this evidence was improper and that the district attorney was guilty of misconduct in bringing it to the attention of the jury. It is not necessary to reiterate what we have already said upon this subject. ■ The evidence which defendant claims was erroneously excluded was attempted to be brought out by the defense on the cross-examination of Mrs. Leece, the wife of the deceased. She was asked by counsel for the defendant when and where she was married to Mr. Leece. The court sustained an objection to the question, and the defendant now contends that this action of the court was error. Although the defendant has devoted a number of pages of his brief in attempting to show that the court erred in refusing to permit Mrs. Leece to answer this

question, we fail to discover one good reason stated in all these pages for upholding this claim of the defendant. Mrs. Leece's evidence was not of vital importance to the case, and even if it were, we cannot perceive how the place or date of her marriage to Mr. Leece, or whether she was married to him at all, would either aid or detract from the defendant's defense. Ordinarily a point of such slight merit as the one now before us would hardly deserve any discussion whatever, but due to the seriousness of the charge of which the defendant stands convicted, we did not feel warranted in ignoring the point altogether. The same may be said of a number of other points relied upon by the defendant. After fully considering them and all other grounds advanced by defendant for the reversal of the judgment, we find no reason which would justify us in disturbing the judgment of the trial court. We are, therefore, of the opinion that it should be affirmed. The judgment and order denying motion for a new trial are affirmed.

Shenk, J., Preston, J., Waste, C. J., and Seawell, J., concurred.

LANGDON, J., Dissenting.—I dissent. The facts which appear from the record do not, in my opinion, justify a judgment of murder in the first degree. I can find no evidence from which it may be inferred that there was premeditation. The defendant and deceased were strangers, and their contact consumed but a few minutes. The deceased, it is clear, was the aggressor; as he passed through the barroom door, he pushed the defendant. The shooting commenced almost immediately afterwards. The only direct testimony concerning the shooting was given by the woman who called herself the wife of the deceased, and, as the majority opinion points out, "her account of the affair was conflicting, incomplete and exceedingly indefinite". It was, moreover, decidedly different from that given previously at the coroner's inquest. The "gas station" in front of which the deceased was killed was a combination of a bootleg place and house of prostitution, and all of the characters involved in this case, either as witnesses or principals, were frequenters of the place.

Under these circumstances, I think it probable that the jury permitted the criminal record of the defendant to warp its judgment, and that the proper verdict, and the only one justified by the evidence, would have been murder in the second degree. The absence of premeditation seems to me so obvious that a judgment of murder in the first degree is unwarranted.

I am of the opinion that the judgment should be modified, under our statutory power (Pen. Code, sec. 1181, subd. 6; *People* v. *Kelley*, 208 Cal. 387 [281 Pac. 609]), to murder in the second degree, and that the defendant should be sentenced therefor as prescribed by law.

Tyler, J., *pro tem.*, concurred.