[Crim. No. 3684. In Bank.—February 28, 1934.]

THE PEOPLE, Respondent, v. MANUEL LARRIOS, Appellant.

Harry H. Parsons for Appellant.

U. S. Webb, Attorney-General, William F. Cleary, Deputy Attorney-General, and Stanley Mussell, District Attorney, for Respondent.

SEAWELL, J.—This appeal is from a judgment imposing the death penalty, and from an order denying a motion for new trial. The defendant was informed against, tried and convicted in the Superior Court of the County of San Bernardino of murder of the first degree. The court thereupon pronounced the death penalty upon him as the law directs in such cases. The jury was fully instructed that it was within its discretion to relieve the defendant of the extreme penalty of the law by its verdict, but in order to do so, in case its verdict should be murder of the first degree, it would be necessary for it to affix the penalty in its verdict at life imprisonment in the state penitentiary, and upon a failure to do so the law imposed the duty upon the trial judge to sentence the defendant to suffer the extreme penalty of the law. That the law imposes the death penalty in such cases is too well settled to require a citation of authorities to the point.

All of the parties to the homicide, including the witnesses to the shooting and those who testified to the material facts

bearing upon the conduct of the actors at the time of, and shortly prior thereto and immediately thereafter, are of Mexican blood.

The shooting of Matias Rodriguez by defendant Manuel Larrios, sometimes called Mariano Alvarado, which resulted fatally a few hours thereafter, occurred on June 4, 1933, near the entrance to the La Luz del Dia Cafe, located at 626 Mt. Vernon Avenue, apparently an outlying business district of the city of San Bernardino, within which area quite a few Mexicans have shops or reside.

The evidence shows that defendant is a native of Mexico and during the last ten years he had resided four years in the state of Colorado and six years in the city of San Bernardino. During the last two years preceding the shooting he resided at the home of Mrs. Martinez, 1271 Spruce Street, situate approximately 800 feet from the place where the shot was fired, at which house it appears that her mother and several children and perhaps one or two other persons resided. ■ The defendant complains that he was not permitted to answer a question put to him as to whether or not the people who lived in said house were under his "charge", and the further question, "Are you the Godfather of any of the children there in that house?" No offer, however, was made by counsel to prove the existence of the facts as implied by said questions and the matter evidently was regarded as one of little importance. While the examination was rather rigidly restricted in this and a few other particulars we cannot say, in view of the whole case, that the defendant was seriously, if at all, damaged by such rulings. The purpose of the above questions doubtless was to show that the defendant was at the Mexican cafe, where the shooting took place, on the peaceful mission of buying some tacos to take to the Martinez home. The purpose of said visit, however, was fully shown by the admitted fact that he purchased six tacos or tortillas, sometimes called Spanish tamales, at said cafe, paid thirty cents for the same and finally reached the Martinez home with them.

While the matter excluded by the court's ruling would have had no direct bearing on the homicide, nevertheless a person on trial for his life should, as against technical objections, be permitted to state, within reasonable limita-

tions, something of his background. In some cases it may have a legitimate influence upon a jury in considering whether or not it should relieve the defendant of the extreme penalty of the law. In meting out the punishment for the commission of the crime of murder a jury, under the statute, is given a wide discretion. (Sec. 190, Pen. Code.) In the instant case it is not probable that defendant suffered injury by the rulings of which complaint is made.

We now turn briefly to the history of the homicide as told by a number of witnesses.

Deceased, Matias Rodriguez, about twenty-six years of age, and his companion, Aniseto Delgardo, also a young man, resided at Bryn Mawr, or Redlands Junction. They had been companions practically all their lives. The deceased resided with his unmarried sister and Delgardo resided not far away. Deceased was the owner of a Ford touring car. On Sunday afternoon, June 4, 1933, some time between 1:30 and 2:30 o'clock, they left their homes to attend a ball game and later rode about San Bernardino until about 8:15 o'clock, at which hour they arrived at the La Luz del Dia Cafe, where they ate their dinners. The deceased and his companion, Delgardo, were strangers to the defendant and to all the other persons at the cafe. The defendant was known to the cafe people, to Reyes and to others residing in the immediate vicinity of the cafe. He seems to have been known as Mariano. Evidently the deceased, by his identification of defendant, had, so far as he could recall, no previous acquaintance with the defendant. Delgardo, his companion, could not recall ever having seen the defendant before he saw him at the cafe on the evening of June 4th. The evidence is to the effect that none of the parties, so far as sobriety was concerned, appeared to be affected with intoxicating liquor.

At the time the deceased and Delgardo entered the cafe, the defendant, who had ordered six tacos, was leaning against the counter or some object, waiting for the owner of the cafe, Mrs. Pattino, to prepare said tacos. Laura Florez, a young Mexican girl, was the waitress. It is the claim of Luis Reyes, admittedly an old acquaintance of the defendant, and no doubt very friendly with him, that he was seated in the cafe when the deceased and his companion entered. The waitress, Laura Florez, and the defendant

corroborate him in this respect. Delgardo, on the other hand, was quite positive that Reyes was not in the cafe when he entered. However this may be, it is certain that deceased and Delgardo seated themselves at a table, and ordered their dinners, and that while they were eating the defendant, who was awaiting his order, left the cafe and presently returned. The waitress finally gave him his order in a paper bag, and he paid her thirty cents therefor, and left the cafe through the street door. The deceased, having finished his meal, went to the washroom and returning paid for the meal and left the cafe a couple of minutes after the defendant. Shortly after the deceased passed through the door into the street a shot was heard. Delgardo's narrative of the shooting was that when he passed outside he saw the deceased and the defendant standing near the deceased's car, facing each other about three feet apart and the deceased had his hand to his side. Delgardo, addressing his companion, asked what had happened. Defendant had the pistol in his hand and when Delgardo asked what had happened he turned the pistol on him and said if "I wanted some that he had some for me." Delgardo said he didn't know what had happened. He didn't know what the trouble was about. The defendant then ran across the street into an alley which led through the opposite block and into a public street paralleling Mt. Vernon Street. Said alley was fenced. Delgardo followed along the fence on the outside of the alley in an effort to note the direction of defendant's flight and saw him turn into said street. In so doing he was not seen by the defendant. Being unarmed he presently returned to his wounded companion, who was in much pain. No one else was in sight. He placed deceased in his automobile and drove him to the city hall and from there he was taken to the hospital, where he died the next day, after an operation in an effort to save his life. Three police officers, who were immediately detailed to apprehend the person who had shot the deceased, went to the cafe and interviewed the young lady waitress and the proprietress. No other person who claimed to witness the shooting was there. From the cafe they went directly to a bakery next door to the cafe and interviewed Mr. Gomez, the proprietor, and from there they went directly to the Martinez home, 1271 Spruce Street, arriving at 9:45 o'clock. The shooting occurred at

about 8:30. At the Martinez home they found the defendant, a Mr. Sandoval, Mary Duval and Mrs. Martinez. They were all in the kitchen. The officers asked the company if there was anyone there named Mariano and were informed by the spokesman that there was no one there by that name. Defendant appeared to be very nervous. Asked if he was Mariano he replied in the negative. A search was made of the house for weapons, but none were found. The defendant was told that he would be taken into the presence of the wounded man for purposes of identification. He denied that he was at the cafe on the night on which the deceased was shot or that he had had any trouble with anyone or knew anything about the matter or that he had a gun. Mrs. Martinez rode by defendant's side to the hospital, representing herself as his sister, and talked with him in a low tone in Spanish during the trip to the hospital. Upon being brought into the presence of the wounded man, who was suffering great pain, the officers asked him if the defendant was the man who shot him. He replied, "Yes, that is the man who shot me; he shot me without any cause. I didn't want to fight." The defendant's reply was, "No." Mrs. Martinez admonished the deceased to "be careful and sure" what he was saying as he was making "a very serious charge". The deceased replied, "He shot me without cause." The defendant was forthwith placed under arrest. The evidence of the eye-witnesses and the uncontrovertible circumstances identified the defendant as the person who fired the shot so completely that he afterward abandoned his defense of alibi and at the trial admitted the shooting, but claimed that he was protecting himself against a threatened assault about to be made upon him by Delgardo and in his attempt to shoot Delgardo he missed his mark and hit Matias Rodriguez, the deceased.

Luis Gomez, a boy seven years of age at the time of the homicide, was very close to the defendant, whom he referred to as Mariano, at the time he fired the shot. His father conducted a bakery adjoining the cafe and the boy was on the outside and saw the defendant fire the shot. He testified that he saw only three men, the defendant, deceased and Delgardo, on the outside of the cafe. He saw defendant, without any words having been passed by any-

one, shoot, and he saw the wounded man assume what he described as a dying position. He also saw the defendant, after hiding a moment behind a truck, flee from the scene. The boy picked up the empty shell which the defendant ejected from his 25-calibre automatic revolver. The boy's testimony is somewhat confusing in its references to the deceased and Delgardo. Several times he used the term "the other man" interchangeably with the deceased and Delgardo. Both men were strangers to him. As to the defendant, whom he knew, there was no confusion as to his part in the commission of the homicide. No justification whatever is shown for the shooting by the boy's testimony.

The defense, which took on a dual aspect, was that Delgardo was the real assailant and that his motive was either to rob the defendant or to assault him with a knife and that the defendant did not in fact shoot at the deceased, Rodriguez, who was an innocent bystander, but hit him by accident. The defendant, in aid of this theory, testified that he had $78 in currency in a bill fold or wallet, which he displayed when he paid the waitress thirty cents for the six tacos and the inference was that the deceased and Delgardo saw the money and Delgardo thereupon formed the intent to relieve him of his money. Neither the girl whom he paid, nor Delgardo, nor anyone else in the cafe saw him with any money other than thirty cents, nor did he produce any convincing proof whatever that he had any such sum of money on his person, or that he had even a wallet. On the other theory, that Delgardo was the aggressor and was attempting to provoke an encounter with him, he testified to the former directing a most insulting word at him, which no one seemed able to satisfactorily interpret. Whether it was a term of unspeakable reproach, or one of trifling significance, remains in doubt. Whether it was spoken at all, and if so its provocative effect, were matters solely for the jury's consideration. The testimony offered by the defendant and his witness Reyes to the effect that Delgardo was advancing upon defendant in a threatening manner when he fired the shot were questions of fact solely for the consideration of the jury and it is not the province of an appellate court to weigh conflicting evidence unless the evidence offered to prove the fact found

is inherently weak or improbable. No such situation is presented by this record. Defendant does not claim that he saw a knife, but that Delgardo was pulling his hand out of his front pocket when he shot. In accounting for the pistol the defendant testified that while running up the alley with the paper bag in one hand and the pistol in the other he stumbled and fell and dropped the pistol and he did not stop to pick it up. He also claimed at the trial that he had but a single cartridge in the revolver chambers. The pistol was not produced at the trial or otherwise accounted for.

The defendant made no satisfactory explanation as to why he waited on the outside of the cafe until the deceased and his companion came out of the cafe. According to the testimony of several witnesses, whom the jury unquestionably believed, the defendant must have waited several minutes for the deceased and his companion to appear. The evidence given by the defendant and witness Reyes as to the order in which the parties left the cafe and what occurred on the outside was contradicted by apparently creditable witnesses offered by the prosecution, one or two of whom were seemingly disinterested persons, and their testimony was sufficient to sustain the verdict of the jury. The testimony of both the defendant and Reyes in a number of particulars is so improbable as to impeach its verity. Reyes, who was a man fifty years of age, made no timely report to anyone so far as the record discloses of the tragedy he claims to have witnessed. The defendant fled from the scene and denied knowledge of the shooting until about the time he was put on trial. No complaint of an attempted robbery or a threatened assault was made by him until he put on his defense. When taken into the presence of his victim and charged with the crime he made no attempt to justify his act, but instead sought to avoid the responsibility of his act by denying that he had any knowledge of the cause of Rodriguez' death.

Appellant assigns a number of the court's rulings as error. In a few instances the rulings may be said to be erroneous in excluding or admitting testimony as to rather unimportant matters, but we are unable to find that the defendant suffered prejudicial injury thereby. One of said assignments consists in the refusal of the court to

permit the defendant to answer a question as to why he had the revolver upon his person. The court in sustaining the objection of the district attorney informed defendant's counsel that he might renew the question on the following day, at which time he would give it further consideration. It does not appear that the matter was again called to the attention of the court. That the defendant had the pistol on his person and used it is admitted and no claim was made that he armed himself for the express purpose of shooting the deceased. No such inference could have possibly been drawn from the mere possession by him of the revolver, nor could it have influenced the jury's deliberations. The crucial question for the jury's determination was whether he was justified in using the deadly weapon in the circumstances of the case. ██ Another assignment of error was directed at the testimony of a witness to the effect that defendant's reputation for peace and quiet was bad. The question as put was whether the witness knew the general reputation of the defendant in the community in which he lived for "truth, honesty and integrity, *and for peace and quiet.*" (Italics ours.) The witness answered that he did. The witness was then asked, "What is his reputation?" His answer was, "Very bad." Defendant's counsel at this juncture stated that he was engaged in talking with his client and he did not hear the last question and answer. The question and answer were read and he then moved to strike out the answer and asked that he be permitted to place an objection to the question. The objection came somewhat late, as the italicized portion of the question at once shows that that portion of the question was objectionable, inasmuch as the defendant had not attempted to show that his reputation for peace and quiet was good. The court, however, permitted the objection to be placed in time, and overruled it. The defendant did not move to strike out the objectionable portion of the question, but his motion went to the entire question. Unquestionably the defendant's reputation for truth, honesty and integrity was put in issue and open to attack the moment he became a witness. Such is the universal rule. That portion of the question was properly in the case. No specific objection was directed at the portion that was amenable to objection. In making objections counsel must call

the attention of the court to the specific subject matter which he deems to be improper. Some four or five other witnesses testified that the defendant's reputation for truth, honesty and integrity was bad, but the question as to his reputation for peace and quiet did not again arise.

■ Another ground of assignment of error is made by reason of the court sustaining an objection to questions asked the defendant as to whether he knew that the deceased and his companion saw the money which he had in his purse; or whether he showed it or exhibited it so that said two men could see it; or whether he knew that said men knew that he had money in his pocket. These questions were separately asked. Strictly speaking, the defendant should have explained how he handled his purse or money, if he had either, and stated the facts from which the jury may have concluded that the deceased and Delgardo should have known that defendant had the sum of money that he claimed to have had upon his person. The line is quite shadowy in some cases as to whether evidence amounts to a conclusion or a statement of fact. We are of the view that it would have worked no hardship on the defendant to have explained the manner in which he handled his wallet, if he actually had one.

■ Complaint is made as to the refusal of the court to permit counsel for defendant to impeach witness Delgardo on the record of the transcript of testimony taken at the preliminary examination without first exhibiting to the witness said testimony, which, it is claimed, is contradictory of his present testimony. Where the testimony of a witness was taken by an official stenographer at the preliminary examination and the transcript of the proceedings was accessible to the defendant he must, where he undertakes to impeach the witness as to his testimony given at said examination, call the attention of the witness to the specific matter, permit him to read the questions and answers, if he so desires, and then ask him if he so testified. The fact that an interpreter was used does not alter the rule. Interrogating the witness in terms of conclusions as to whether his testimony at said hearing was contradictory of his present testimony is clearly not permissible.

Many of the assignments are not well taken. Either the alleged error was afterward corrected—as, for example, the

defendant was not allowed to state at an early stage of the trial the country of his birth, but later did so state, or the matters complained against were so inconsequential as not to require detailed analysis.

■ A number of instructions, especially the one defining the weight to be given to flight, and self-defense, are assailed. In every instance said instructions were but a repetition of the well-approved instructions of this court on the subjects to which they relate. The complaint that the instruction on flight had no application to the facts of this case is wholly without foundation. That the defendant fled from the scene of the crime and· attempted to conceal his identity as the person who fired the shot which resulted in the death of Rodriguez, so far as the fact is concerned, might as well be conceded. It is not open to question. We have examined all the instructions given by the court and it cannot be said that the defendant was denied any legal right either in giving the instructions as a whole or refusing to give certain instructions offered by the defendant.

■ On motion for a new trial the counsel for appellant has filed an affidavit in which he avers refusal on the part of the sheriff or jailer to permit counsel to interview his client through an interpreter of his own choice. Further complaint is made that the prosecution instructed several witnesses not to give the defense any information as to what their testimony would be at the trial. If this affidavit correctly set forth the attitude of the sheriff and district attorney they exceeded their authority in the premises. While the affidavit contains averments of unauthorized acts on the part of said officers, it contains no averment that counsel for the defense was denied the privileges which the law guarantees to every person charged with crime to prepare his defense. The day on which the unauthorized acts are averred to have taken place was July 3d, prior to the setting of the case. Affiant does not aver that he did not thereafter interview said witnesses, except the defendant himself, and it does not appear that he would not have been granted the right to converse with his client through his own interpreter rather than the official interpreter had he so requested. It appears that the matter was brought to the attention of the court but once, and while it was under consideration by the court counsel for defendant re-

laxed his effort and nothing further appears to have been done in the matter. He admits that during the trial his interpreter sat by his side. The defendant evidently spoke English to some extent. It will be observed, however, that counsel does not anywhere aver that he was in any wise hindered or deprived of the opportunity of fully developing his defense, or that he was injured by the matters set forth in his affidavit. No continuance or adjournment was requested or complaint made to the court that the defense was not fully prepared and ready to go forward with its case. The transcript of testimony which we have carefully read, consists of more than 250 pages and it does not appear from an examination thereof that defendant was embarrassed or hindered in any way in the preparation and development of his case.

Appellant presented a second affidavit on motion for new trial in which Mary Moreno Duval is the affiant. She is doubtless the woman who was at the Martinez home, where the defendant was apprehended at the time the officers visited said place shortly after the shooting. She gave no information as to her identity other than her name. She avers that she was 150 feet distant from the parties when she saw after nightfall an altercation between the three parties in question; that the defendant was using the paper bag in an effort to protect himself from Delgardo, who was advancing upon him; that the defendant, after being followed, drew his pistol; that she covered her eyes; that hearing no shot she removed her hands from her eyes and saw the deceased and Delgardo trying to take the gun away from the defendant and that he retreated. Affiant again covered her eyes and heard a shot. When she opened her eyes the defendant was running away from the scene of the trouble. After a minute or two she went into the cafe and asked the owner if she heard the shot and she was told that it was simply backfire from the automobile.

The record contains a third affidavit made by Jennie Mercado. The substance of her brief affidavit is that she was waiting in the kitchen of said cafe for an order of sandwiches and that she observed through a window frame one foot square, set in the door leading into the dining-room, Reyes, Rodriguez and Delgardo eating their meals in the adjoining room; that when the defendant paid Laura

Florez for the tacos she saw him take from a pocket-book a paper bill and he also took some silver therefrom and paid Laura Florez for said tacos; that defendant left the cafe and was immediately followed by Delgardo; that Rodriguez followed Delgardo and Reyes followed some seven or eight feet behind the deceased; that she heard a shot. That she went outside a few minutes thereafter, but she saw no one; that Mary Duval passed her going into the cafe. From the crowd she afterward learned someone had been shot.

The affidavits upon scrutiny are not impressive. Furthermore, all of the affiants were acquaintances of defendant and no excuse is given as to why they were not called as witnesses. Appellant explains that the district attorney was required under the statute to call Reyes. There is no merit in this claim. Neither party is required to call any person as a witness whose testimony he is not willing to vouch for. A district attorney who should call a witness whom he had reason to believe would testify falsely in favor of either the defendant or the People would violate his oath of office. Reyes was called by the defense.

Between the period of conviction and motion for a new trial the court informed counsel that in the absence of proof of specific motive, and also because of the shortness of time which elapsed from the time that the defendant left the cafe and the shooting, which occurred a few minutes thereafter, he was uncertain as to whether the jury should have found the defendant guilty of a greater crime than murder of the second degree. Upon further examination of the law on the subject the court announced that it was satisfied that the crime constituted murder of the first degree and pronounced the judgment from which this appeal was taken.

 It is well settled that the prosecution is not required to prove motive. Proof of the existence of motive, or a want of such proof, is obviously a matter which the jury should, and doubtless does always, consider in arriving at its verdict. But proof of motive, if the evidence is otherwise sufficient to support the verdict, is not made a prerequisite to a conviction.

██ The law implies malice when there is manifested a deliberate intention to take the life of a fellow creature. It is *implied,* when no considerable .provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. (Sec. 188, Pen. Code.) The evidence supports the implied finding of the jury that the killing was without provocation and was committed under circumstances which showed an abandoned or malignant heart. ██ If it would have been murder for the defendant to have intended to kill Delgardo and in the execution of such attempt he unintentionally killed Rodriguez, the unlawful intent is transferred from the person intended to be killed by the given act to the person actually killed. The law applies with equal force and effect to the killing of the latter as it would have applied to the unlawful killing of the former.

The rules of law by which malice aforethought and premeditation are to be determined have been so thoroughly settled by section 188 of the Penal Code, and the many decisions of this court beginning with our earliest—making special reference to *People* v. *Iams,* 57 Cal. 115, where the subject was profoundly considered and the rule herein stated was definitely adopted, and ending with our latest decision, *People* v. *Fleming,* 218 Cal. 300 [23 Pac. (2d) 28]—that nothing may be added which would better assist juries and courts in their effort to fathom the intent of persons charged with homicides. Said rules form an important part of our criminal law structure and are our judicial guides in judging the intention and purposes of men in the commission of wilful and voluntary acts which are so violent in form as to ordinarily result in the death of or cause great bodily harm to the person against whom they are directed.

The rule as restated in *People* v. *Fleming, supra,* may here be repeated, as it answers the objection made by appellant as to shortness of time intervening between the intention to kill and the act of killing in the instant case as it did in the Fleming case:

''But this court has said on innumerable occasions that in order to prove premeditation in one charged with murder it is not necessary to show that any appreciable space of time elapsed between the intention to kill and the act of

killing. It is only necessary to quote from *People* v. *Hunt,* 59 Cal. 430, 435, the following statement of the law on this subject: 'There need be no appreciable space of time between the intention to kill and the act of killing; they may be as instantaneous as successive thoughts of the mind. It is only necessary that the act of killing be preceded by a concurrence of will, deliberation, and premeditation on the part of the slayer, and if such is the case, the killing is murder in the first degree, no matter how rapidly these acts of the mind may succeed each other, or how quickly they may be followed by the act of killing.' The precise language of this decision has been repeated on numerous occasions by this court and the principle there enunciated is irrevocably established as a part of the law of this state. (*People* v. *Bellon,* 180 Cal. 706, 710 [182 Pac. 420].)''

In those cases where one "with no considerable provocation" viciously or wickedly shoots down another, section 188 of the Penal Code, implies malice. The same is true when the killing shows an abandoned and malignant heart. The evidence is amply sufficient to sustain the implied finding that the defendant acted "with no considerable provocation" in bringing about the death of Rodriguez. There is some evidence in the record on the part of defendant and his witness, Reyes, which, if believed, would tend to afford some evidence of express malice or premeditation on the part of the defendant. Reyes testified that when the defendant was inside the cafe either Delgardo or Rodriguez said something to the defendant which he was unable to hear. The defendant also testified that when he walked toward the piano to drop a nickel in the slot he heard one of the men "say something, but I did not understand what they said, and I turned around and went back". Subsequently he was asked if either of the men said anything to him while inside of the cafe and his answer was, "Not a single word." Whether he smarted under a fanciful belief that some reference had been made to him by the deceased or his companion while in the cafe, is somewhat confused on account of the defendant's inconsistent and contradictory testimony, but it is beyond question that he was armed and that he left the cafe first and waited, according to the testimony of several witnesses, from 3 to 5 minutes on the outside and immediately upon the appearance of the deceased he

shot him. There was no reason why he should have waited on the outside, and if he had feared any mistreatment at the hands of the deceased and his companion, who were peaceably eating their meals, he would have gone his way and the killing would not have happened. His waiting on the outside and his quick action upon the appearance of the deceased would indicate malice or premeditation.

The case is one resting entirely upon the testimony of witnesses whose credibility was subjected to the scrutiny of the jury, and there appears to be no reason why its findings of fact should be questioned by this court. The conduct of the defendant following the homicide is absolutely inconsistent with the conduct of a person who felt the consciousness of justification. His testimony in accounting for his act and the circumstances thereof is not impressive. This court in such cases is not authorized to interfere with the judgment of conviction.

The judgment and order appealed from are affirmed.

Shenk, J., Thompson, J., Preston, J., Waste, C. J., and Curtis, J., concurred.