[Crim. No. 4234. In Bank.—November 9, 1939.]

THE PEOPLE, Respondent, v. RODNEY GREIG, Appellant.

Charles H. Brennan and Leo A. Sullivan for Appellant.

Earl Warren, Attorney-General, and F. Walter French, Deputy Attorney-General, for Respondent.

CURTIS, J.—The appellant herein was charged with the crime of murder. He entered pleas of not guilty and not guilty by reason of insanity. Thereafter he withdrew his plea of not guilty, waived a trial by jury, and his case came on for trial by the court acting without a jury. The court

first heard evidence upon his plea of not guilty by reason of insanity, and at the conclusion of the hearing found that the appellant was sane at the time of the commission of the crime charged. Thereupon the court held a further hearing at which evidence was taken to determine the degree of the crime of murder of which the appellant was guilty. Upon the hearing, the court determined that the appellant was guilty of murder of the first degree and fixed his punishment at death. A motion for a new trial was denied by the court. This appeal from the judgment rendered herein comes before us by virtue of the provisions of section 1239 of the Penal Code directing that when judgment of death is pronounced an appeal is automatically taken from said judgment.

The facts of this case present one of the most shocking and indefensible homicides to be found in the criminal history of this state. A youth on the threshold of manhood, being barely twenty-one years of age, holding a responsible position as stenographer and statistical clerk in the office of one of the transcontinental railroads, without any provocation or reason, suddenly plunged the blade of a large hunting knife, some six inches in length, into the heart of a young girl about his own age with such force that it pierced her breast bone, the right lung, the pericardium, the right ventricle of her heart and entered a large vein behind the heart, with the result that his victim suffered instant death. The facts in more detail, gained principally from his own voluntary statement, show that on the evening of December 6, 1938, he met Leona Vlught in a cafe in Oakland. "Several months" prior thereto, he had met her for the first time at this same cafe and "went out with her at that time". Since then and the evening of December 6, 1938, he had not seen her to go out with her. During these intervening months, he had only seen her to say, "hello". He had no previous engagement to meet her on the evening of December 6th. On that occasion he arrived at the cafe at about 10:30, and remained there approximately three hours, or until about 1:30 of the next morning, spending part of the time with the girl, while she during the evening associated with other patrons of the place as well as with appellant. The appellant did not take the witness-stand at his trial, but soon after his arrest, he made a statement to a police officer of the

actions of himself and Miss Vlught after they left the cafe. This officer as a witness in the case, related appellant's statement, apparently in appellant's own words, as follows:

"I left to get my car to take her home. We met in front of the Wonder Bar. I was not alone. Joe Moore went with me to get the car and he left after I picked Leona up. While on Twelfth Street met two girls and a fellow and talked a little while, five or ten minutes. We decided to go home. We decided not to go home and went to Acme Club in El Cerrito and had some noodles. Stayed there until 3:10, that is in the morning. We went there because of a good cook out there. From there we went out on the county farm, turned around and then went up on the top of 106th Avenue and parked after hitting a big ditch. She then complained about her appendicitis when the car jolted her. She sat and talked a long time from about 3:45 to 5:00 a. m. Then I got out and urinated. After I did I came back to the right side of the car, not to the driver's side and she was still complaining about her appendicitis hurting and about her family trouble. She was going to take poison. That her father would miss her for a couple of weeks and her mother a little longer, then forget her. I took out the knife and showed it to her jokingly and told her she did not have the nerve to use it. I handed it to her, the handle toward her, and she grabbed it. Then I twisted it out of her hand. We discussed how sharp it was and I pricked her on the skin of the throat lightly and asked her if she was afraid to have it go all the way in, and she said, 'You would be doing me a favor', and we talked along in that tone for a couple of minutes. I had the knife by the handle, without any more ado, I gave it a thrust. I stood back and left it in about fifteen minutes. She was still in the front seat. I then took the knife out and dragged her over to a gully. I then cut the dress away and stuck the knife into the skin at the throat to see if there was any blood. There was not. So I drove away and I went to East 14th Street and down to Oakland, then home in Berkeley." The officer further testified, "He was asked how about the hat and the other things. He said, 'It was in the car until tonight when I put it in the paper sacks and threw them in the garbage can where I showed you.' He was asked, 'How about the jewelry?' He answered, 'I put that in my pocket at 5:30 tonight. The necklace was

around her neck, but it broke when I took her out of the car.' He was then asked, 'You knew it was wrong to kill her? He said, 'I know now that I did wrong, yes.' 'Did you always carry a knife?' He said, 'Only when I went in that lower part of town.' 'You carried it with you when you went around to those cafes?' He said, 'Yes'."

The evidence further shows that appellant arrived at his Berkeley home at about 6 o'clock in the morning of December 7th. He went to his place of employment at the usual time that morning, worked through the day, went home, had dinner, and went to bed. Appellant lived with his parents and two younger brothers in the family home in Berkeley. The body of the girl was found at about 9:30 on the morning of her death by an employee of the United Air Lines in a little ravine or gulch, apparently where it had been placed by the appellant earlier in the morning. The Oakland police were notified, and soon arrived and viewed the body. Later pictures of the body as it lay in the ravine were taken and at the trial introduced in evidence. The examination of the case led the officers to suspect the appellant as the perpetrator of the crime. They went to his home and arrested him at about 9:30 on the evening of December 7th. After his arrest, appellant was taken outside his home, and directed to unlock his car which was parked nearby. He was asked about some jewelry belonging to Miss Vlught which he denied having. Inspector Duffy who was inspecting the car found three bobby pins, and stated they were similar to pins which had been picked up at the scene where the body was found. Appellant said nothing when these pins were produced, and Inspector Duffy went back to the car and soon returned with a hunting knife. When the knife was produced, the appellant stood for a moment and then said, "You have got me." He was asked if that was the knife that he had used "in the act where the girl met her death." He replied, "Yes." To the further question propounded to him as to why he killed the girl, he replied, "Oh, just a silly argument." After delivering to the officers certain effects of the girl consisting of a watch, a locket and chain, two keys, and a miniature photograph, the appellant directed the officers to an ash can in which he said he had thrown her hat, purse, and other articles, all of which were found in two paper sacks in the ash can. He was then taken

to the City Hall at Oakland where the statement herebefore quoted from was made to the police officers.

On the following day, December 8th, the appellant made a further statement of the same events to the district attorney. This statement was by questions and answers and was taken down in shorthand. The facts therein related differ but slightly from those contained in the statement given to the arresting officers. He told that after he had plunged the knife into the chest of the girl, he walked back away from the machine and stood there smoking cigarettes for about fifteen minutes when he returned to the car, and to quote his own words, ''And she wasn't making any motion or anything, so I took her out of the automobile and went over to this ditch that we had run into, and I cut away the top of her dress and examined the wound, and then I stabbed her in the neck to see if there would be any blood flowing. Since no blood flowed, I knew she was dead, and I left immediately.'' He then related his various movements from then on until he arrived at his home in Berkeley.

Appellant first contends that the evidence taken at the trial on his plea of not guilty by reason of insanity preponderated in favor of said plea and showed that he was insane at the time of the commission of the homicide.

 It is the settled rule in this state that a person charged with crime is presumed to be sane until the contrary is established by a preponderance of the evidence. (*People* v. *Williams,* 184 Cal. 590, 593 [194 Pac. 1019].) The jury, or in this case the trial judge, was the sole judge of the weight to be given to such evidence. The finding of the court upon the issue of insanity cannot be set aside or disturbed if there is any substantial and credible evidence in the record to support such finding. (*People* v. *Willard,* 150 Cal. 543 [89 Pac. 124].) In that case the court fully considered this question and answered it in the following language [page 553]: ''This court cannot disturb a verdict unless there is no evidence to support it, or where the evidence relied on by the prosecution is apparently so improbable or false as to be incredible, or where it so clearly and unquestionably preponderates against the verdict as to convince this court that its return was the result of passion or prejudice on the part of the jury. In a case presenting any of these features this court would deal with it as a

matter of law. Such a situation, however, can only be presented on appeal in extreme cases, and, notwithstanding the claim of appellant, the record before us does not disclose any such case. It presents the usual and ordinary situation where the evidence was conflicting as to the only real question in the case,—the insanity of the appellant,—and the jury finding against it, and their finding being supported by material evidence, is conclusive on this court.''

Of course, the same rule applies to the finding of the trial court when the action is tried by the court without a jury. If there is material evidence in the record supporting such finding, it is conclusive on a reviewing court. We do not understand that appellant contends that there was not substantial and material evidence before the trial court in support of the finding of the court that the appellant was sane at the time of the commission of the homicide. The only claim which he makes respecting the sufficiency of the evidence is that it preponderated in favor of his plea of insanity. This claim was properly made before the trial court, and decided against the appellant. This claim has no place on his appeal, as the only question before the court on appeal, as stated before, is whether there is any substantial evidence supporting the finding of the trial court.

An examination of the testimony in this case reveals ample evidence from which the trial court concluded that appellant was sane. His mother did testify respecting her son's early life and told of spells, four in number, which had similarity in some respects to epileptic seizures, the last of which occurred during appellant's sixteenth year, over four years prior to the date of the crime of which he was accused. She also testified that he was sullen and morose at times, and of his lack of sociability, and that on occasions his acts appeared irrational. She revealed that he had been arrested for petty offenses, and that as he approached maturity he had taken to drinking. She told of his early marriage and its annulment, that he had threatened to commit suicide, and gave details of many unusual actions and propensities. There was also given in evidence the appellant's family history in which it was shown that there were a number of definite cases of insanity, drunkenness and suicides among his antecedents both in the paternal and maternal branches of his family.

Five experts were examined and testified on the subject of appellant's sanity. Two were produced by the appellant, one of whom, Dr. Sidney K. Smith, testified that in his opinion the appellant was insane in the legal sense at the time he killed the girl but was at the date of the trial perfectly sane. The other expert, Dr. Edward W. Twitchell, produced by the appellant, was not so positive in his statement as to the appellant's state of mind at the time of the homicide. When asked what his judgment was in view of the whole case, he replied. "It is quite possible that he, or even probable, that he had an epileptic equivalent at that time [the killing]. The whole thing seemed to me to be so utterly without excuse, carefully as I questioned him, I was unable to find anything that seemed to make it necessary or expedient to him to do what he did. The act seemed to be a senseless automatic sort of an act." Dr. Smith had testified that appellant was in an "epileptic equivalent" at the time of the homicide; that while in such a state the person so affected is partially unconscious to such an extent that he does not know the difference between right and wrong. The witness was of the opinion that this condition came over appellant just before he plunged the knife into his victim's body and continued something like one-half hour thereafter.

This condition is described as an unconscious state suffered by some epileptics as an equivalent of the seizures which the same or other persons may at other times suffer in connection with epilepsy. All the experts were in accord with the theory that a person while in the state or condition, denominated by them as "an epileptic equivalent", is unconscious of his acts and therefore there is no possibility of there being any malice or premeditation regarding any act committed by him while in that state.

Dr. Smith's opinion that appellant was insane at the time he killed the deceased was based upon his conclusion that at that time the appellant was in "an epileptic equivalent". Dr. Twitchell, the other expert called by appellant testified as follows: "Unconsciousness and memory don't reconcile. The individual who is unconscious does not remember the things which occurred during the time of his unconsciousness. That is one of the distinguishing features in separating epilepsy and hysteria." He further testified that, "It is quite possible that he, or even probable, that he had an [epileptic]

equivalent at that time [referring to the time of the killing], and what he did may have been done during an equivalent, as to whether or not he had an equivalent at that time, I cannot swear as I was not there.'' With Dr. Twitchell testifying that he could not swear that appellant had an epileptic equivalent at the time of the killing, this leaves the evidence of Dr. Smith as the sole support of the defense's theory that appellant killed the girl while laboring under a condition of mind in which he was unconscious, and therefore acted without malice or premeditation. Each of the three experts appointed by the court testified that he was of the opinion that the appellant was not in an epileptic equivalent but was sane at the time he killed the deceased. All five of these medical experts were examined at length by the attorneys both on direct and on cross-examination and by the court as well. It would serve no useful purpose to detail the evidence of each witness and to set forth the reasons for their respective views. Conceding that each gave a plausible and reasonable explanation for his opinion respecting the appellant's mental condition, it would appear rather unreasonable to contend that the evidence of these three experts under the circumstances hereinbefore related was not sufficient to support the finding of the trial court that the appellant was sane at the time of the homicide. Indeed, when we consider that three reputable physicians testified to the appellant's sanity, one was in doubt as to his mental condition, and the other one was of the opinion that he was of unsound mind at the time in question, it might reasonably be said that the preponderance of the evidence was against the plea of insanity interposed by appellant.

There is another consideration which we think worthy of mention in connection with the evidence of these experts, and particularly with that of Dr. Smith. One of the invariable consequences of one laboring under the condition of an epileptic equivalent according to the undisputed evidence of these experts, is his unconsciousness of what transpires during the continuance of this condition and his failure to remember the things which occurred during the time of his unconsciousness. Yet the evidence is without dispute or conflict that the appellant on the night of his arrest made a statement to the arresting officers in which he related every detail of what occurred that night from the time he met the deceased until

his return home in the early hours of the next morning, including every act of his, both immediately before, at the time of, and subsequent to the killing of his victim. The same may be said respecting his statement given to the district attorney on the following day. His two statements respecting his actions on the occasion in question are in perfect agreement, except that the statement made to the district attorney goes into more details of the killing than his prior statement to the officers, as the later statement was brought out by questions propounded to him by the district attorney, which were directed to every conceivable act of either the appellant or the deceased from the time he left his home in the evening after dinner until he was arrested on the evening of the following day. In this searching examination given him by the district attorney, he did not deviate in any material respect from the voluntary statement he had given the officers on the night of his arrest. The only detail of any particular importance which he omitted from his first statement, and which was given to the district attorney, was that after he had plunged the knife into the breast of the girl he walked away a couple of steps and stood there for about fifteen minutes smoking cigarettes and then returned to the automobile and removed the knife which was still imbedded in the body of his victim. The relation by appellant of all of these events that transpired during the time just referred to would seem to be a complete refutation of the claim that appellant was then in a condition in which he was unconscious of his acts.

If then we were called upon to rule upon the question as to whether the evidence upon the issue of appellant's insanity preponderated in favor of or against his plea of insanity, we would be compelled to hold that not only did appellant fail to prove by a preponderance of the evidence he was insane at the time he committed the homicide, but that the preponderance of the evidence sustains the claim of the prosecution that appellant was sane at that time. However as stated above, the question of the preponderance of the evidence is not before us. Our inquiry is to determine whether the record contains substantial evidence in support of the finding of the trial court upon the issue of appellant's sanity, and having determined that question our task is at an end.

Appellant next contends that the court erred to his serious prejudice in the order of proof upon the issue of his sanity. As we have seen, appellant withdrew his plea of not guilty and rested his case solely upon his plea of not guilty by reason of insanity. At the inception of this hearing, the court made the following statement: "I might state to the other gentlemen [undoubtedly referring to the attorneys for the appellant] that I have asked Mr. Coakley [the deputy district attorney] instead of resting upon the presumption of sanity, that I might get the picture of this case from the start, that some, at least some of the evidence surrounding the offense, be put before the court so that the court might not only have a picture of what happened, but that the medical experts here might also have the picture." No objection by appellant having been made to this suggestion of the court, the prosecution proceeded to introduce as witnesses, the mother of the deceased girl, the two officers who arrested the appellant, together with the statement made to them by appellant on the night of his arrest, and two physicians, one of whom had performed an autopsy upon the body of the deceased girl and the other of whom had made laboratory tests of certain specimens taken from the deceased's body. No evidence, expert or otherwise, bearing upon the appellant's sanity was either offered or admitted at this time.

Appellant contends that the order of proof in a proceeding to determine the sanity of a person accused of crime is fixed by section 1369 of the Penal Code, and that by the provisions of that section the order of proof is fixed as follows, first, counsel for the defendant must open the case and offer evidence in support of the allegations of insanity, second counsel for the people may then open their case and offer evidence in support thereof, third, the parties may then each offer rebutting evidence.

This section of the code applies only to an "Inquiry into the Insanity of the Defendant before Trial or after Conviction." It is not expressly made applicable to the trial of a defendant upon his plea of not guilty by reason of insanity. Neither section 1026 of the Penal Code, which among other things provides for the trial of the question of a defendant's sanity after his plea of not guilty by reason of insanity, nor any other section of said code of which we have any knowledge, contains any express directions as to the order of proof

to be followed in such a trial. Assuming, however, that section 1369 of the Penal Code is applicable to a trial of a defendant who has entered a plea of not guilty by reason of insanity, and, therefore, the defendant in such a case has the right to open the case and offer evidence in support of his plea of not guilty by reason of insanity, we are unable to conceive of any legal reason for holding that the appellant was prejudiced by the procedure followed in this case. After the comparatively brief testimony offered by the prosecution at the suggestion of the court in order that the latter might receive "a picture of the case", the appellant was given an opportunity to fully present his evidence in support of his plea of not guilty by reason of insanity. His evidence including the cross-examination of his witnesses is included in 700 pages of the 1200 pages of the reporter's transcript in this action. Appellant offers no argument nor suggests any reasonable theory to support his claim that he was prejudiced by the court's direction respecting the order of proof at the trial of his sanity, nor does he cite us to any authority which tends to support this claim. We are satisfied that if the court committed any error in so directing the order of proof, and we do not hold that it did, any such error was harmless and resulted in no prejudice to appellant.

 Finally the appellant contends that the evidence was not sufficient to justify the finding of the trial court that appellant was guilty of murder in the first degree and he claims that by virtue of the power and authority with which an appellate court is now clothed by the provisions of section 1181 of the Penal Code, it is our duty to reduce the degree of crime from murder of the first degree as fixed by the trial court to murder of the second degree. In support of his contention, he relies upon *People* v. *Kelley,* 208 Cal. 387 [281 Pac. 609], and *People* v. *Howard,* 211 Cal. 322 [295 Pac. 333, 71 A. L. R. 1385]. In each of these two cases the defendant was found guilty of murder in the first degree and the death penalty imposed. In the Kelley case, the judgment was modified and reduced to manslaughter on the ground that there was nothing in the record from which it might with reason be argued that the injuries inflicted on the deceased were inflicted "with that intent or that malice aforethought which is a necessary ingredient of the crime of murder".

That question cannot arise in the present case for the reason that the appellant withdrew his plea of not guilty and stood trial solely upon his plea of not guilty by reason of insanity. The withdrawal of his plea of not guilty under those circumstances was tantamount to a plea of guilty. (*People* v. *Kimball,* 5 Cal. (2d) 608 [55 Pac. (2d) 483].) Having pleaded guilty to the charge of murder, the appellant is now precluded from raising the question as to his intent in taking the life of the deceased and also as to whether he acted maliciously in killing her. ██ Murder is defined as ''the unlawful killing of a human being, with malice aforethought''. (Sec. 187, Pen. Code.) The only question before the trial judge was the degree of the crime of murder, as the degrees of murder are defined under section 189 of the Penal Code. Under appellant's present contention that is the sole question now before us. The Kelley case can therefore be dismissed without further comment. A somewhat different situation was before the court in the Howard case. The defendant, had pleaded not guilty, but the jury had found him guilty of murder in the first degree. He contended on appeal that the evidence was insufficient to sustain the verdict of the jury finding him guilty of murder in the first degree. In reviewing the evidence, this court concluded that it was sufficient to sustain a charge of murder in the second degree only, and directed a modification of the judgment accordingly. In that case we held [page 329] : ''To be murder of the first degree, under our statutè, the killing must be premeditated, except when done in the perpetration of certain felonies; that is to say, the unlawful killing must be accompanied with a deliberate and clear intent to take life. If the act be preceded by, and be the result of a concurrence of will, deliberation and intent, the crime of first degree murder is proved. (*People* v. *Bellon,* 180 Cal. 706 [182 Pac. 420].) '' However, in the discussion of the evidence which consisted principally of the defendant's confession, we held that it was not legally sufficient to sustain a conviction of murder in the first degree. We find no such infirmity in that respect in the evidence before us, even if we confine our review thereof to the confession of the appellant. His account of the killing has already been set out in full. In this account he told that the girl complained about her appendix hurting her and about her family trouble; that she was going to take poison; that

her father would miss her only a couple of weeks and her mother a little longer; that he then took out the knife and showed it to her jokingly and told her she did not have the nerve to use it; they discussed how sharp it was and he pricked her on the skin of the throat lightly and asked her if she was afraid to have it go in all the way and she replied that he would be doing her a favor, and that they talked in that way a couple of minutes; that he had the knife in his hand and without any more ado, he gave it a thrust, and stood back and left it in about fifteen minutes. If we accept this statement of appellant as a true account of the killing of the deceased, it shows a clear case of murder in the first degree, and removes from the case entirely any principle of law announced in the Howard case.

■ It is argued that there is an entire absence of any evidence showing any motive on appellant's part which would prompt him to take the life of the decedent. It has been held on innumerable occasions by this court and other appellate courts of this state that proof of motive in the commission of the crime of murder is not essential to sustain a judgment of conviction. We cite in support of this principle of law only the recent case of *People* v. *Larrios,* 220 Cal. 236, 251 [30 Pac. (2d) 404], and 13 Cal. Jur., p. 685.

■ It is further claimed that there is no proof that the killing of the deceased was malicious. The evidence conclusively showed that there was a deliberate intention on the part of the appellant to unlawfully take the life of the deceased, and malice is express when there is manifested a deliberate intention to take the life of a fellow creature. (Sec. 188, Pen. Code.)

■ Some question is raised as to whether the killing of the deceased was done with sufficient deliberation to amount to premeditation on the part of the appellant. We have seen from the quoted statement of the appellant, made to the arresting officers, and thereafter confirmed by a later examination by the district attorney, that defendant and deceased for some minutes prior to the killing discussed the possibility of his taking her life. They commented on the sharpness of the knife blade. He pricked her throat lightly with the point of the knife and asked her if she were afraid to have it go all the way in and she replied that he would be doing her a favor, and they talked in that tone for a couple of minutes when

without further ado he plunged the knife into her breast to its very hilt. Probably a more complete case of premeditation has never been made out in the courts of this state than the one we have here from the lips of the appellant himself.

In the early case of *People* v. *Hunt,* 59 Cal. 430, 435, it was said: "It is only necessary that the act of killing be preceded by a concurrence of will, deliberation, and premeditation on the part of the slayer, and if such is the case, the killing is murder in the first degree, no matter how rapidly these acts of the mind may succeed each other, or how quickly they may be followed by the act of killing." This language has been approved repeatedly by later decisions of this court, and has been quoted with approval in the following of our recent decisions: *People* v. *Bellon,* 180 Cal. 706, 710 [182 Pac. 420] ; *People* v. *Fleming,* 218 Cal. 300, 310 [23 Pac. (2d) 28] ; *People* v. *Larrios,* 220 Cal. 236, 252 [30 Pac. (2d) 404].

In the Fleming case, after quoting the language of the Hunt decision, the court added, "The precise language of this decision has been repeated on numerous occasions by this court and the principle there enunciated is irrevocably established as a part of the law of this state."

In the case of *People* v. *Bellon, supra,* we find the following language: "It is difficult to attribute any other design than that of killing to one who knowingly strikes at the throat of another with a sharp razor with such force and strength as to cause death." This language, in our opinion, aptly applies to the case against appellant herein. We find it most difficult to come to any other conclusion than that of wilful, deliberate murder from the act of the defendant in plunging the sharp blade of the hunting knife into the breast of the deceased with such force and strength as to pierce her lungs and heart, causing her instant death. In our opinion, the evidence amply supports the finding of the trial court that the degree of murder of which the appellant is guilty is murder in the first degree.

The judgment is affirmed, and the order denying appellant's motion for a new trial is affirmed.

Houser, J., Carter, J., Shenk, J., and Edmonds, J., concurred.