[Crim. No. 5932. Second Dist., Div. Three. Sept. 12, 1958.]

THE PEOPLE, Respondent, v. WILLIAM HAROLD LANE, Appellant.

Al Matthews, under appointment by the District Court of Appeal, for Appellant.

Edmund G. Brown, Attorney General, and Carl Boronkay, Deputy Attorney General, for Respondent.

SHINN, P. J.—In a jury trial, William Harold Lane was convicted of the second degree murder of Casimir Buda. A separate trial was held on Lane's plea of not guilty by reason of insanity; the jury found that defendant was sane at the time the offense was committed. Lane made a motion for new trial, which was denied. Probation was likewise denied, and defendant was sentenced to state prison for the term prescribed by law. Lane appeals from the judgment.

The conviction was based upon evidence of the following facts. Defendant and Buda were patients in the Krueger Sanitarium in Lancaster, which houses about 60 men suffering from tuberculosis. The patients live in cabins; near the cabins is a recreational area provided with tables and chairs. One of the patients, Manuel Carpio, was walking across the recreational area shortly after noon on August 2, 1956. He looked up and noticed Buda on the ground in a half-seated position about 75 feet away from him; Buda was attempting to lift himself up by his hands. Defendant was standing about

5 or 6 feet in front of Buda, whose back was toward Carpio; Lane was holding an ax. Buda took a handkerchief out of his pocket, wiped his forehead, then backed up as defendant followed him. A moment later, defendant walked around a nearby building. Lane was then seen entering his cabin by Paul Mikes, who was also a patient. Defendant was carrying an ax. Mikes was shown a hatchet by the deputy district attorney and stated that it was the same one he had seen in defendant's hand.

Alvin Krueger, manager of the sanitarium, was summoned by Carpio. Krueger assisted Buda to his office and telephoned for an ambulance. Buda was in a state of shock and was bleeding from several lacerations on his head. Krueger searched Buda's clothing, but found no weapons. Shortly thereafter, Krueger had a conversation with defendant outside the office. When asked by Krueger what had happened, Lane said: "Well, I got him; I got him, he got what was coming to him." Krueger attempted to question him further, but defendant replied: "I got my rights; I got my rights, I don't have to say anything."

F. W. Dornberger, a Los Angeles County sheriff's deputy, arrived at the sanitarium at 1 o'clock. Someone handed him an ax that was wrapped in a piece of blue flannel; he examined the ax and the wrapping for blood stains, but found no traces of blood. The hatchet had been retrieved from defendant's cabin by a patient named Taffinder. Taffinder testified that he went to Lane's cabin and found the ax resting against his bedside table. He wrapped it in a pajama top and took it to the office. There was no blood on the ax when he saw it in the cabin. He identified an ax shown him by the prosecutor as the one he gave to Officer Dornberger.

After examining the ax, Dornberger went to the recreational area and discovered blood stains on the ground about 5 or 6 feet away from a table and some chairs; a trail of blood led back to the office. Dornberger then had a conversation with defendant. He asked Lane what had happened and Lane replied that he had an argument with Buda over a woman. When asked where the argument took place, defendant said "Over there," but did not indicate any particular place. In response to further questioning, Lane said: "I hit him with a hatchet, it was self-defense, and he pulled a knife on me."

Defendant was arrested and taken to the sheriff's station, where he was questioned later that afternoon by H. A. Waldrip, who was one of the investigating officers in the case. When asked whether he had struck Buda, defendant replied

that he did not want to talk and that he would only talk to the district attorney. Buda died August 11th. Waldrip had another conversation with defendant on the following day. The officer asked Lane if he killed Buda and defendant again answered that he did not want to talk.

An autopsy was performed on the body of Casimir Buda shortly after his death. Dr. Chapman, the autopsy surgeon, testified that death was caused by a skull fracture, with cerebral laceration and hemorrhage. In the doctor's opinion, the fracture was probably caused by a blow struck by a hard object; the ax identified by Mikes and Taffinder could have produced the injury. On cross-examination, Chapman admitted that Buda could possibly have struck his head against a hard object, though that was very unlikely. The doctor also admitted that Buda had a collapsed lung and his life expectancy was poor.

Defendant testified in his own behalf that he did not know Casimir Buda and had never heard of him. On August 2d he had breakfast in the mess hall at 8 a. m. He took a short walk, then returned to his cabin and read a newspaper and a magazine. Around 10 o'clock, he "blacked out" and did not recover consciousness until sometime in the afternoon, when he found himself sitting in a police car. He had suffered previous blackouts, the last one occurring in 1954 at another sanitarium. He did not tell anyone about losing consciousness on August 2d. Lane denied having a conversation with Officer Dornberger at the sanitarium and denied having met Officer Waldrip. He did not talk to Krueger and did not tell him he hit Buda with an ax.

As mentioned earlier, defendant was convicted of murdering Buda and the jury determined the offense to be murder of the second degree. At the commencement of the sanity proceeding, Lane's attorney moved that the matter be heard by a different jury upon the ground that the jurors were prejudiced against his client and could not try the question fairly; the motion was denied by the court.

The evidence at the sanity trial consisted of the testimony of Lane, of Krueger, who was called as a defense witness, and of Doctors Smith, Olsen and McGinnis, three psychiatrists who had been appointed by the court to examine defendant. It was stipulated that the jury might also consider the evidence introduced with respect to the criminal charge.

Krueger testified that Lane had lived in the sanitarium for a year prior to August 2, 1956. He had spoken to defendant

on several occasions and had observed his conduct. In his opinion, Lane had the capacity to distinguish between right and wrong on the date of the offense. Defendant was bitter and resentful toward everyone because of his confinement in a sanitarium. On one occasion, he heard Lane say: "When I am emperor of this universe, I am going to change all of these things." Defendant kept a club and a piece of iron pipe on his bedside table; he told Krueger that he did so for protection.

Lane testified that he had been suffering from tuberculosis since 1930 and had spent considerable time in various sanitariums; Carpio and Mikes appeared as witnesses for the People because they hated him as he was a police informer; when he was in other cities, he informed the police about "crimes in general"; he had asked his attorney to excuse one of the jurors, who was Chinese, because he had many enemies among the Chinese. Ever since childhood he had suffered from symptoms of insanity, such as having hallucinations and hearing voices. He did not tell the psychiatrists about the hallucinations but he told them about his blackouts. On cross-examination Lane was asked if he realized that it was wrong for one person to take a human life without any justification; defendant replied that it was wrong.

Dr. Smith testified that he examined defendant on two occasions while he was in custody. In the opinion of the witness, Lane's mental condition was good, although he had paranoid and schizophrenic tendencies, and he knew the difference between right and wrong on August 2, 1956. Dr. Olsen testified that he had examined Lane twice in December, 1956. In his opinion, defendant was legally sane on August 2d, although he "deviated from the normal mentally" and was exceptionally suspicious and apt to interpret the behavior of others as hostile or unfriendly toward him. These are characteristics of a paranoid personality. Dr. McGinnis examined defendant once in October, 1956. He gave his opinion that Lane was suffering from an emotional disorder, but was legally sane both at the time of the examination and at the time he committed the offense. In the doctor's opinion, Lane had either a personality disorder with a paranoid state or was afflicted with schizophrenia of a paranoid type.

The first contention to be considered is the insufficiency of the evidence to sustain the conviction. In support of this contention, defendant urges the following points: (1) Buda had a poor life expectancy on August 2, 1956, hence his death

on August 11th was probably due to tuberculosis or other natural causes; (2) No blood stains were found on the ax that was claimed to be the murder weapon; (3) Lane denied knowing Buda. The argument is without merit. The weight to be accorded to Dr. Chapman's opinion respecting the cause of death was a question for the jury. (*People* v. *Tucker*, 88 Cal. App.2d 333, 340 [198 P.2d 941].) The jurors were warranted in giving credence to his testimony that Buda died as the result of being struck on the head by a hard object and that the ax defendant was seen holding could have produced the fatal injuries. The jury could reasonably infer from this testimony, together with the testimony of the other patients in the sanitarium, the evidence of Lane's statements to Krueger and to Officer Dornberger, and the evidence of his failure to deny the commission of the crime when questioned by Officer Waldrip, that defendant was guilty of murdering Buda. Lane's denials of guilt merely created a conflict in the evidence, which was resolved against him by the triers of fact. (*People* v. *Newland*, 15 Cal.2d 678 [104 P.2d 778].)

The remaining contention to be considered is the insufficiency of the evidence to support the finding that defendant was legally sane at the time of the offense. The matter was properly submitted to the same jury which tried the criminal charge. (Pen. Code, § 1026.) Under well-established rules, which we may not question, the jury had to determine whether Lane was suffering from such "a defect of reason, from disease of the mind . . . as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know he was doing what was wrong." (*People* v. *Wells*, 33 Cal.2d 330, 350 [202 P.2d 53]. See also *People* v. *Berry*, 44 Cal.2d 426, 433 [282 P.2d 861].)

A person charged with crime is presumed to be sane until the contrary is shown by a preponderance of the evidence. (*People* v. *Hickman*, 204 Cal. 470, 477 [268 P. 909, 270 P. 1117]; *People* v. *Daugherty*, 40 Cal.2d 876, 901 [256 P.2d 911].) And where a finding of sanity is based upon substantial evidence in the record, it may not be disturbed on an appeal. (*People* v. *Greig*, 14 Cal.2d 548, 553 [95 P.2d 936].) The testimony of the three psychiatrists called by the People, together with the testimony of Krueger, amply sustains the conclusion of the jury that defendant was sane at the time he committed the offense.

The judgment is affirmed.

Wood (Parker), J., and Vallée, J., concurred.